United States District Court
Southern District of Texas

**ENTERED**

November 10, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WELL CELL GLOBAL LLC and WELL CELL SUPPORT LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-22-3062 |
| SHAWN PAUL CALVIT, MARC PIERRE DESGRAVES IV, CHARLES ALEXANDER ELLIOTT, PATRICK DALE LELEAUX, M.D., INSULINIC OF LAFAYETTE LLC, INSULINIC OF HIALEAH LLC, INSULINIC OF HAWAII, LLC, INSULINIC OF GRETNA, LLC, and INSULINIC OF HAMMOND, LLC, | § § § § § § § § § § | |
| Defendants. | § § | |

**MEMORANDUM AND OPINION
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Well Cell Global is a Texas healthcare company that conducts research and development related to the treating individuals with diabetes and other metabolic disorders. Well Cell Global's commercialization arm, Well Cell Support,[1] manages Well Cell Global's portfolio of intellectual property. Well Cell Global claims that its treatment differs from conventional insulin treatments for metabolic disorders because Well Cell Global's modality, which it calls "physiologic insulin resensitization," focuses on treating the root causes of metabolic disorders rather than suppressing the symptoms of those disorders. Well Cell Support, via a master license, licenses Well Cell Global's intellectual property to health care facilities, including clinics. The licensees included the defendants, Insulinic of Lafayette (Louisiana), and Insulinic of Hialeah (Florida), from September

---

[1] The court distinguishes Well Cell Global and Well Cell Support for clarity when needed and otherwise refers to the plaintiffs together as "Well Cell."

and November 2021 until the purported termination of the licenses in July 2022.  Well Cell alleges that, after it terminated its license agreements with the Insulinic defendants in July 2022, they continued unlawfully to use Well Cell's intellectual property, including its pumps and its training materials, and plan to continue to do so without a license or other right.[2]  Well Cell seeks a preliminary injunction ordering the defendants to cease their unlawful conduct until a permanent injunction hearing.   Well Cell argues that it will suffer irreparable harm from the defendants' unlawful use, including the loss of customer goodwill, and that the public is at risk of harm from the defendants' unlicensed use of the Well Cell medical treatment for insulin dependent diabetics.

Based on the parties' motions and briefs, the record, the evidence presented in the preliminary injunction hearing, and the applicable law, the court grants the motion for a preliminary injunction in part.  The findings and conclusions are set out below.[3]

## I.     The Evidence in the Record[4]

On October 31 and November 1, 2022, the court held an evidentiary hearing on Well Cell's motion for a preliminary injunction.  (*See* Docket Entry Nos. 70 (Transcript of Preliminary Injunction Hearing, Oct. 31, 2022 ("Oct. 31, 2022 Tr.")), 71 (Transcript of Preliminary Injunction Hearing, Nov. 1, 2022 ("Nov. 1, 2022 Tr."))).  Well Cell called Scott Hepford, Well Cell's managing member and CEO, as its sole witness.  The defendants cross-examined Hepford but did not call witnesses of their own.

---

[2] The defendants are Shawn Paul Calvit, Marc Pierre Desgraves IV, Charles Alexander Elliot, Insulinic of Lafayette LLC, Insulinic of Hialeah LLC, and Insulinic of Hawaii LLC.

[3] Any findings of fact that are more properly conclusions of law are so deemed.  Any conclusions of law that are more properly findings of fact are so deemed.

[4] The parties' exhibits largely overlap.  Because Well Cell did not file its exhibits on CM/ECF, the court cites to the defendants' filed versions.  The defendants have highlighted certain material in those documents. The court does not consider the highlighting to be part of the record and disregards it when citing to the exhibits.

At the hearing, the court admitted the following exhibits:

### A.    Well Cell's Admitted Exhibits

| Well Cell Exhibit No. | Description |
|---|---|
| 1 | Asset Purchase Agreement between Diabetes Relief LLC and Well Cell Global LLC, dated July 24, 2020 |
| 2 | Certificate of Registration—Diabetes Relief Website |
| 3 | Certification of Registration—Overcoming Metabolic Failure |
| 4 | Certificate of Registration—Glucose Homeostasis V.2 |
| 5 | Patent Registration—'595 Patent |
| 6 | Patent Registration—'990 Patent |
| 7 | All Patent Assignments and Patent Notice for '990 Patent |
| 8 | Master License Agreement—Well Cell Global to Well Cell Support |
| 9 | License Agreement—Well Cell Support/Insulinic of Lafayette |
| 10 | License Agreement—Well Cell Support/Insulinic of Hialeah |
| 11 | Unpaid Invoices for Insulinic of Lafayette and Hialeah |
| 12 | Notice of Default from Scott Hepford to Shawn Calvit, dated June 9, 2022 |
| 13 | Insulinic Press Release, dated Aug. 26, 2022 |
| 14 | Cease and Desist Letter, dated Sept. 7, 2022 |
| 15 | Letter to Shawn Calvit re: Demand to Comply with Termination Obligations, dated Sept. 30, 2022 |
| 16 | Diabestesrelief.com Website, as of Sept. 7, 2022 |
| 17 | Insulinic.com Website, as of Sept. 7, 2022 |
| 18 | Defendant Well Cell Global LLC's Response to Plaintiff Carr's TCPA Mot. to Dismiss and Exh. 4 to the same, dated Jan. 20, 2021 |
| 19 | Deposition Transcript of Scott Hepford, dated Sept. 28, 2022 |
| 20 | Deposition Transcript of Shawn Calvit, dated Sept. 28, 2022 |

### B.    The Defendants' Admitted Exhibits

| Defs. Exhibit No. | Description |
|---|---|
| 1 | Deposition Transcript of Scott Hepford, dated Sept. 28, 2022 |
| 2 | 2022 Filing with the State of Texas for Diabetes Relief LLC |
| 3 | Patent Registration—'595 Patent |
| 4 | Patent Registration—'990 Patent |
| 5 | Certification of Registration—Overcoming Metabolic Failure |
| 6 | Certificate of Registration—Glucose Homeostasis V.2 |
| 7 | Asset Purchase Agreement between Diabetes Relief LLC and Well Cell Global LLC, dated July 24, 2020 |
| 8 | Verification of Scott Hepford, dated Aug. 24, 2020 |
| 10 | Master License Agreement—Well Cell Global to Well Cell Support |
| 11 | Deposition Transcript of Shawn Calvit, dated Sept. 28, 2022 |
| 12 | License Agreement—Well Cell Support/Insulinic of Lafayette |

| 13 | License Agreement—Well Cell Support/Insulinic of Hialeah |
| 14 | Nondisclosure, Noncircumvention, and Confidentiality Agreement between Diabetes Relief LLC and Shawn Calvit, dated April 15, 2021. |
| 17 | Notice of Default from Scott Hepford to Shawn Calvit, dated June 9, 2022 |
| 19 | Email from Lloyd & Mousilli to Shawn Calvit with Cease and Desist Letter, dated September 7, 2022 |
| 20 | Exhibits to Well Cell's Mot. for TRO and Prelim. Injunction (Docket Entry Nos. 4-1 through 4-10) |
| 21 | Exhibits to Well Cell's Response to Carr's TCPA Mot. to Dismiss, dated Jan. 20, 2021 |
| 23 | Affidavit of Scott Hepford (Docket Entry No. 14) |
| 24 | Insulinic.com Website, as of Sept. 7, 2022 |
| 25 | Insulinic Press Release, dated Aug. 26, 2022 |
| 30 | Well Cell Support, LLC Receipt for Infusion Pumps Order from Infinity Health, dated Nov. 4, 2021 |

## II.    The Legal Standard

A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. V. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013).   "For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, No. 19-10874, 2022 WL 3906582, at *3 (5th Cir. Aug. 31, 2022).

### C.    Well Cell's Motion to Reopen Evidence

Following the hearing, Well Cell moved to reopen evidence and supplement the record with an agreement purporting to assign retroactively the patents in suit from Diabetes Relief to Well Cell Global.  (Docket Entry No. 66).  The defendants opposed the motion.  (Docket Entry No. 72).  The court grants the motion, but notes that, as explained below, this agreement is without effect for purposes of Well Cell's motion.

**D.     Defendants' Motions to Strike Portions of the Affidavit of Scott Hepford and Unsworn Declaration of Kelly McDaniel**

The defendants have moved to strike certain paragraphs from the declaration of Scott Hepford and unsworn declaration of Kelly McDaniel done in support of Well Cell's motion. (Docket Entry Nos. 44, 45).  Well Cell has not yet filed oppositions to these motions.  The court does not rely on the disputed contents of the Hepford affidavit or McDaniel declaration in this opinion.

The motions to strike are denied as moot.

**III.    Findings of Fact**

**A.  Background**

The patents and copyrights that Well Cell asserts in this lawsuit were originally issued and assigned to Diabetes Relief LLC.  On July 24, 2020, Diabetes Relief and Well Cell Global entered into an asset purchase agreement,[5] in which Well Cell Global agreed to purchase Diabetes Relief's assets, including its intellectual property.   (Docket Entry No. 48-2 § 1(a)).   The intellectual property includes U.S. Patent Nos. 9,652,595 and 10,533,990.  (*Id.* § 1(a)(ii)(1)–(2)).  The asset purchase agreement provides that "[a]t Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser." (*Id.* § 6).  The agreement provides that "[t]he Closing of the purchase and sale of the Assets will take place on July 24, 2020." (*Id.* § 5).  "Closing" is defined as "the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration and the transfer of title to

---

[5] The asset purchase agreement was the subject of litigation brought by one of Diabetes Relief's members, Hunter Carr, against its other members, Hepford and Dr. Stanley Lewis.  (Oct. 31, 2022 Tr. at 30:18–22, 31:1–4).  Well Cell's counsel has represented that litigation relates, at this point, only to the value of Carr's shares in Diabetes Relief and not the validity of the asset purchase agreement.  (*Id.* at 33:12–21).  The defendants have not put forward evidence calling that assessment of the state of the litigation into question.

the Assets."  (*Id.* § 1(b)).  The agreement further provided that the balance of the purchase price

would be paid according to a schedule, the final payment of which has not been made.  (*Id.* § 10;

*see also* Nov. 1, 2022 Tr. at 178:17–18 ("Well Cell has not paid the entire purchase price yet.")).

The agreement provides that Diabetes Relief will perform certain obligations with respect to the

asset transfer:

> At Closing and upon the Purchaser paying the Purchase Price in full to the Seller,
> the Seller will provide the Purchaser with duly executed forms and documents
> evidencing transfer of the Assets, where required including, but not limited to, bills
> of sale, assignments, assurances and consents.  The Seller will also cooperate with
> the Purchaser as needed in order to effect the required registration, recording and
> filing with public authorities of the transfer of ownership of the Assets to the
> Purchaser.

(Docket Entry No. 48-2 § 7).

Following the hearing on the preliminary junction, (*see* Docket Entry No. 66 ¶ 9), Diabetes

Relief and Well Cell entered into an agreement, entitled "Nunc Pro Tunc Assignment," assigning

the patents in suit to Well Cell Global, purportedly effective as of July 24, 2020.  (Docket Entry

No. 67).

In September and November of 2021, Well Cell Support entered into license agreements

with Insulinic of Lafayette and Insulinic of Hialeah.  Shawn Calvit, whose background includes

laboratory sales but who does not have experience in developing or administering medical

treatments, is an owner and the managing member of both entities.  (Docket Entry No. 48-4

(Deposition Transcript of Shawn Paul Calvit, Sept. 28, 2022 ("Calvit Tr.")) at 50:16–22, 109:24–

110:7).  The provisions of those agreements were largely identical.  The license agreement granted

the Lafayette and Hialeah Insulinic entities certain rights to use Well Cell's patents and trade

secrets.  (Docket Entry Nos. 48-5, 48-6).

The agreements provide that the "LICENSEE agrees that LICENSOR has complete

authority to change any . . . rules it deems necessary for use under this Agreement."  (Docket Entry

No. 48-5 § 3(C)).  They further provide that "LICENSOR may terminate this Agreement . . . upon TEN (10) days' notice if LICENSEE . . . refuses to comply with any of the terms and conditions set forth in this Agreement and fails to cure such default within THIRTY (30) days."  (*Id.* § 4(B)).

On June 9, 2022, Hepford, as Manager of Well Cell Support, sent a notice of default to Calvit and the Insulinic entities.  The notice stated:

> You are in violation of Paragraph 5B and your assurance that you []at all material times have been in compliance in all material respects with all laws, regulations, rules, orders, judgments, decrees, and other requirements and policies imposed by any governmental entity applicable to it, its owners, its properties, or the operation of its business transactions.  This especially applied to all matters involved involved with billing for services performed under your license agreements.

(Docket Entry No. 47-10).  On September 7, 2022, Well Cell's counsel sent Calvit and the Insulinic entities a letter by email demanding they cease and desist from using the intellectual property and trade secrets covered by the agreements.  (Docket Entry No. 47-12).  The letter stated that Well Cell would initiate litigation if verification of compliance with the letter was not delivered within 24 hours.  (*Id.* at 4).

Well Cell filed this lawsuit on September 8, 2022.  (Docket Entry No. 1).  The next day, Well Cell filed a motion for a temporary restraining order and preliminary injunction.  (Docket Entry No. 4).  The court granted the application for a temporary restraining order following a hearing, (Docket Entry No. 17), and later extended that order with the parties' agreement.  On October 31 and November 1, 2022, the court held an evidentiary hearing on Well Cell's motion for a preliminary injunction.  At the hearing, the parties argued their positions and Well Cell offered the testimony of Scott Hepford, its managing member and CEO.  The defendants cross-examined Hepford but did not call any of their own witnesses.  In the period between the issuance of the TRO and the preliminary injunction hearing, the defendants moved to dismiss Well Cell's

complaint, (Docket Entry No. 35), and Well Cell filed an amended complaint.  (Docket Entry No. 43).

## B.    A Substantial Likelihood of Success on the Merits

### 1.    Well Cell's Standing to Assert Its Claims[6]

The defendants attack Well Cell's standing to assert the '595 and '990 Patents and the other intellectual property purportedly acquired from Diabetes Relief through the asset purchase agreement, on the basis that Well Cell lacks legal title to that property.  (Docket Entry No. 47 at 16).

### a.  Patent Claims

The defendants argue that the patents in suit are assigned to Diabetes Relief, which is not a party to this lawsuit, and have not been assigned to Well Cell Global or Well Cell Support.  (*Id.* at 16–19).  The defendants are correct that legal title is essential to maintaining an infringement action at law for damages.  *Arachnid, Inc. v. Merit Indus., Inc*., 939 F.2d 1574, 1579 (Fed. Cir. 1991) ("The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement.").  A *nunc pro tunc* assignment of a patent—such as that recently executed between Diabetes Relief and Well Cell Global—does not convey standing if standing was lacking when the suit was filed.  *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010).

The asset purchase agreement provides that Diabetes Relief will assign title to the patents to Well Cell Global upon "Closing and upon Purchaser paying the Purchase Price in full to the

---

[6] Although Well Cell's proposed findings of fact and conclusions of law include findings related to its trademark infringement and breach-of-contract claims, those claims are not properly before the court because they were not the subject of Well Cell's motion for a preliminary injunction.

Seller." (Docket Entry No. 48-2 § 6). Although the deal has "closed," payment of the full purchase price appears to be a condition precedent to the delivery of Diabetes Relief's assets, including its patents, to Well Cell Global. The agreement defines "Closing" as "the payment of agreed consideration," and states that "Closing . . . will take place on July 24, 2020." The agreement also states that the "agreed consideration," which appears to be the "Purchase Price," will not be paid in full until 2024. In any event, no document clearly demonstrates that assignment of the patents from Diabetes Relief to Well Cell Global or Well Cell Support has occurred. (*Cf.* Nov. 1, 2022 Tr. at 175:11–176:2).

Although an agreement to assign does not—until the assignment is made—vest a party with legal title to a patent, it may convey equitable title and support equitable relief for infringement. *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991) ("[A] federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding equitable relief for that infringement."). An agreement that promises to assign a patent in the future, if enforceable, may permit the promisee—here, Well Cell Global—to bring an action in equity with respect to the patent. *Id.* at 1581 ("[A]n agreement to assign in the future . . . may vest the promisee with *equitable* rights in those inventions . . . ."); *Gellman v. Telular Corp.*, 449 F. App'x 941, 945 (Fed. Cir. 2011) ("The district court was therefore correct in its conclusion that the Unsigned Agreement, if enforceable as a contract, could do no more than create an equitable claim for the Lebowitz Trust. And as already mentioned equitable claims do not themselves confer standing [for an action at law for damages].").

The asset purchase agreement provides that Diabetes Relief will assign the patents to Well Cell upon "Closing and upon the Purchaser paying the Purchase Price in full to the Seller." (Docket

Entry No. 48-2 § 6).   Based on this promise to transfer legal title to Well Cell, the court finds that Well Cell possesses equitable title to the '595 and '990 Patents and has standing to seek an injunction against the defendants.

### b.  The Copyright Claims

Only the "legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right."  17 U.S.C. § 501(b).  The certificates of registration for the copyrights were issued to Diabetes Relief and have not been subsequently assigned in writing, as required under 17 U.S.C. § 204(a).  *See also Lyrick Studios, Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 391–92 (5th Cir. 2005) (discussing § 204(a) requirements).  Under the terms of the asset purchase agreement, Well Cell is not the legal owner of the copyrights in question.  The paradigmatic example of a beneficial owner of a copyright is one who assigns legal title to another in exchange for the payment of royalties, establishing an equitable trust relationship.  *Batiste v. Island Records Inc.*, 179 F.3d 217, 221 n.2 (5th Cir. 1999).  In fact, the "only . . . example of an approved 'beneficial owner' suit is set forth in the legislative history of the Copyright Act, which describes the term 'beneficial owner' as 'includ[ing], for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.'"  *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 393, 414 (2d Cir. 2018) (quoting H.R. Rep. No. 94-1476, at 159).  The Second Circuit's careful analysis of beneficial ownership under the Copyright Act concluded that a beneficial owner must have an interest that "derives its value directly from another person's use of an exclusive right, such that the interest is necessarily 'diluted' by infringement." *Id.* at 415 (quoting reference omitted).

The evidence shows that Diabetes Relief has prospectively assigned its copyrights to Well Cell Global, but the assignment will not be complete until Well Cell Global makes payment in full to Diabetes Relief.  Well Cell Global's future interest in the copyrights is not a beneficial

ownership, because its interest is not derived from Diabetes Relief's use of an exclusive right. Well Cell Global has not provided authority stating that a party who has contracted to acquire legal title to copyrights from another party may maintain an action as the beneficial owner of the copyright before an assignment or other transfer of the copyright.

The court finds that, on the current record, Well Cell does not have standing to pursue its copyright claims.

### c.   The Trade Secrets Claims

Courts applying Texas law have held that "one 'owns' a trade secret when one knows of it, as long as it remains a secret." *In re Cayman Island Firm of Deloitte & Touche*, No. 04-01-00491-CV, 2001 WL 1042233, at *3 (Tex. App.—San Antonio Sept. 12, 2001, no pet.) (quoting *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001); *Williams Consol. I, Ltd. v. Smith*, No. 8-cv-766, 2009 WL 10698215, at *6 (S.D. Tex. Oct. 19, 2009) (same), *report and recommendation adopted*, No. 4:08-CV-766, 2009 WL 10698262 (S.D. Tex. Nov. 19, 2009); *NTGSH JV, LLC v. Williams*, No. 20-cv-2469, 2021 WL 4440325, at *2 (S.D. Tex. Sept. 22, 2021) ("[A] party has standing to sue for trade secret misappropriation when it is a closely aligned corporate affiliate of the legal owner [of the trade secrets] and maintains the integrity of the trade secret." (quoting *Smith*, 2009 WL 10698215, at *6)).

Based on the close relationship between Well Cell Global and Diabetes Relief, and Well Cell Global's efforts to protect its intellectual property as trade secrets, Well Cell has standing to assert its trade secrets claims.

### 2.   The Termination of the License Agreement

At the preliminary injunction hearing, Hepford testified that a billing group that the defendants had selected to perform billing for services had informed Well Cell that the defendants had engaged in improper billing practices.  The improper practices included billing for more

complicated procedures than had actually been performed.  (Nov. 1, 2022 Tr. at 45:9–25).[7]  The

improper billing practices reported included improper billing for services covered by Medicare.

(*Id.* at 46:12–24).  The notice of default sent to Calvit explicitly referred to "matters involved with

billing for services performed under your license agreements" as reasons for termination.  (Docket

Entry No. 47-10).

The defendants have not presented evidence sufficient to rebut or call into question Well

Cell's contention that the license agreements were properly terminated.  The court finds that Well

Cell terminated the license agreements, at the latest, on September 7, 2022, prior to its filing of

this suit.  (Docket Entry No. 47-12).

### 3.  The Substantive Claims

#### a.  Copyright Infringement

As stated above, on the current record, Well Cell lacks standing to assert its copyright

claims and is therefore unlikely to prevail on those claims.

#### b.  Patent Infringement

To establish patent infringement, a party must show that the alleged infringer "without

authority makes, uses, offers to sell, or sells any patented invention." 35 U.S.C. § 271(a).

> A determination of infringement involves two steps: First, the court
> determines the scope and meaning of the asserted patent claims. The
> court then compares the properly construed claims to the allegedly
> infringing device to determine whether all of the claim limitations
> are present, either literally or by a substantial equivalent.

*Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318–19 (Fed. Cir. 2011).

---

[7] The court considers Hepford's testimony as evidence that the statement was made, not for the statement's
truth regarding the impropriety of the billing.

The burden shifting framework applicable to challenges to patent validity applies in the context of a preliminary injunction.  "With regard to the first factor—establishing a likelihood of success on the merits—the patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  "[T]he patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Id.*  "[I]f a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue."  *Id.* at 1377.  Although their brief in opposition to Well Cell's motion suggests that the defendants may ultimately challenge the validity of Well Cell's patents, (Docket Entry No. 47 at 19–20), the defendants stated at the preliminary injunction hearing that they do not, at this time, challenge the validity of the patents.  (Oct. 31, 2022 Tr. at 13:18–21).  The patents are presumptively valid.

The defendants did challenge the allegation that they are infringing Well Cell's patents. They argue that neither patent prohibits them from using the insulin infusion pumps or the IV tubing infusion cassettes they acquired from Well Cell, because those components are not the subject of Well Cell's patents.  (Docket Entry No. 47 at 20).

The abstract of the '595 Patent describes it as a "kit for individualized intravenous exogenous insulin-based therapy, which includes a portable data storage in communication with [a] client device processor."  (Docket Entry No. 47-2 at 1).  In his deposition, Hepford stated that the '595 Patent is a "kit" patent.  (Docket Entry No. 48-1 (Deposition Transcript of Scott Hepford, Sept. 21, 2022 ("Hepford Tr.")) at 253:14–16).  At the hearing, Hepford testified that, along with

the '990 Patent, the '595 Patent claims "an algorithm." (Nov. 1, 2022 Tr. at 150:20–22).  He

testified at his deposition that the physical technologies enumerated in the '595 Patent are not the

focus of Well Cell's licenses to the Insulinic defendants:

> This . . . patent, along with trade secrets, know-how, show-how and a bunch of other
> things go into educating providers to be able to perform a highly individualized
> modality that shifts and moves whether they have meters.  We provide meters.
> That's irrelevant to the point of the technology, the technique, the know-how, show-
> how is what is actually being licensed.
>
> So having an actual individualized meter is irrelevant.  The protocols overarching
> articulate what to do with it.  So it is not the thing.  It is how the thing is used.

(*Id.* at 255:1–12).  The "kit" is only "part of the modality" that Well Cell licenses to clinics.  (*Id.*

at 257:6–8).  Hepford insisted that the patent was not "a checklist of what goes in a bag and goes

out the door to a licensee." (*Id.* at 270:21–24).

Exactly what the '595 Patent claims proved difficult for Hepford to explain.  Hepford

repeatedly blurred the lines between the patent claims and other information provided or taught to

Well Cell's licensees.  At the hearing, discussions of the '595 Patent often turned back to other

aspects of Well Cell's treatment modality.  For example, counsel for the defendants asked, "Can

you tell me how this pump [mentioned in the patent] . . . how it compares the blood glucose test

results to the plurality of therapeutic ranges?" Hepford responded:

> Again, you're conflating two totally different things.  That's not speaking to the
> pump.  This is the overarching modality; and that encompasses what we've taught
> the person, plus the dosing protocols, all the charts, their handheld computer, the
> device itself.  And all of those things also have templates, care plan templates, that
> they're using to program all this stuff into.  It helps them organize all their
> information that they're gathering to make a medical decision and make
> adjustments on devices and dosing ranges.

(Nov. 1, 2022 Tr. at 181:12–24).  Hepford's deposition contained similar exchanges in which he

was unable to describe with precision what he called "patent lawyer legalese." (Hepford Tr.. at

266:10).

Like the words on here [that is, the '595 Patent] represent everything that is ultimately in the patent or that's in—yes, in the patent, but also in the kit. And that kit is a component of everything that they are taught.

But if I hand them what you have on this page, no one understands that. So that's where the know-how, show-how trade secret comes in at being able to actually apply the words that are on this page into the whole thing that they get licensed to actually go use.

(*Id.* at 270:8–16).

Hepford's testimony suggests that the use of the pumps and IV cassettes provided to the defendants under the license agreements does not on its own indicate infringement of the '595 Patent. Without greater understanding of the actual scope of the '595 Patent, which Hepford was unable to provide, the court cannot assess whether the defendants are likely infringing the '595 Patent.

It is Well Cell's burden to demonstrate a likelihood of success on the merits. It has not done so with respect to the '595 Patent.

The abstract of the '990 Patents states that it is "[a]n individualized intravenous exogenous insulin-based therapy for infusing insulin intravenously to a subject or a patient to improve impaired hepatic glucose processing." (Docket Entry No. 47-3 at 1). The '990 Patent claims protocols used to determine dosing ranges as part of Well Cell's patented "modality." (Nov. 1, 2022 Tr. at 149:6–20). Although the '990 Patent does not include the most specific aspects of the modality, Hepford testified that someone could perform the protocols and administer the appropriate doses of insulin to individual patients using only the information conveyed in the '990 Patent. (*Id.* at 149:21–150:5). The '990 Patent refers to "administrative data storage," which is apparently an "encrypted data room." The evidence shows that the defendants had access to this "room" and the stored data, and could have easily copied both, and had to copy both to continue to use the Well Cell treatment after their licenses were terminated. (*Id.* at 192:13–193:19).

15

Hepford testified that language used by the defendants on their website matches the language found in Well Cell's administrative data storage.  (*Id.* at 194:4–16).

Calvit's testimony indicates that the defendants continue to perform therapies aimed at treating metabolic conditions with exogenous intravenous insulin therapy.  Calvit testified that the therapy the defendants now perform "[is] similar in that we are still putting IV into somebody's veins, but the timing, the amounts, and their process is different."  (Calvit Tr. at 101:9–12).  He tesfieid that the process was different because, with Well Cell's modality, "you keep the patient continuously doing an infusion non-stop for, I think, a period of three hours, and the other process, if I'm not mistaken, has them start for a certain period of time, then stops, gives . . . like a rest of thirty minutes or something like that, then starts up again."  (*Id.* at 103:4–10).  Calvit's testimony indicated that the defendants used their purportedly different therapy with the pumps acquired from Well Cell, until they were instructed to cease using those pumps.  (*Id.* at 105:7–11).  This testimony would indicate the pumps were fungible, but elsewhere Calvit testified that the defendants' new pumps "offered more flexibility on modalities."  (*Id.* at 106:9–10).

Calvit's minimal ability to differentiate the current therapy offered by the defendants does not effectively rebut the charge that the defendants are infringing the '990 Patent.  The asserted differences between the defendants' current practices and the Well Cell modality do not, at this stage, appear sufficient to allow the defendants to escape the charge that they are infringing the '990 Patent.

The court finds that the record shows that the defendants are likely infringing by practicing the therapy disclosed by the '990 Patent.

The court finds that Well Cell has demonstrated a likelihood of success on its claim for infringement of the '990 Patent but has not shown a likelihood of success on its claim for infringement of the '595 Patent.

### c.    Trade Secrets Claims

To show a violation of either the DTSA or TUTSA, a party must show that "(1) the trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022). The DTSA requires a showing that the product was used in interstate commerce.  18 U.S.C. § 1836. Both statutes define trade secrets and misappropriation similarly.  *See* 18 U.S.C. § 1839; Tex. Civ. Prac. & Rem. Code § 134A.002.

At common law, "[m]isappropriation of trade secrets is shown by proof (1) that a trade secret existed; (2) that the trade secret was acquired through a confidential relationship; (3) that the defendant used the trade secret without authorization from the plaintiff; and (4) that the owner sustained damages." *SPS Austin, Inc. v. Wilbourn*, No. 03-20-00054-CV, 2021 WL 5456659, at *9 (Tex. App.—Austin Nov. 19, 2021, no pet.) (citing *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs., LLC*, 404 S.W.3d 737, 744 (Tex. App.—El Paso 2013, no pet.).

To determine whether information is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen. Univ. Sys., Inc. v. Lee*, 379 F.3d 131,

150 (5th Cir. 2004) (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc*., 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd). All six factors need not be satisfied "because trade secrets do not fit neatly into each factor every time." *Gen. Univ. Sys*., 379 F.3d at 150 (quoting *Bass*, 113 S.W.3d at 740).

Calvit testified in his deposition that he believed that Well Cell's trade secrets include "[its] process for physiologic insulin resensitization and their patent on their pumps," specifically, how the insulin resensitization procedure "is done in reference to their patent." (Calvit Tr. at 178:14–23). When Calvit met with representatives of Diabetes Relief, he had to, and did, sign a nondisclosure agreement before the meeting. (*Id.* 175:9–17). He understood that the purpose of that agreement was "[t]o not tell other people about someone's business." (*Id.*). Calvit also testified that at least some of the people he brought to a didactic training session at Well Cell also signed a nondisclosure agreement with Well Cell. (*Id.* at 194:18–24). Calvit understood that anyone who attended a training session on the Well Cell insulin infusion treatment had to sign a nondisclosure agreement to get access to the training and technology. (*Id.* at 195:15–20).

Well Cell took extensive steps to keep its insulin infusion treatment and other knowledge secret from competitors. Hepford testified that the patents were deliberately drawn with enough specificity to be issued, while not revealing the details of Well Cell's modality. (*See, e.g.*, Nov. 1, 2022 Tr. at 133:10–15 ("This [information revealed in the '595 Patent] . . . is the range. There's . . .the far extreme limits. What they're taught, then, in how to apply [the patent] is the know-how, the show-how, the trade secrets."); *see also id.* at 149:3–20).

Calvit testified in his deposition that the Hawai'i Insulinic clinic had no license from Well Cell. (Calvit Tr. at 211:2–8). He testified that he knew that a press release had been issued announcing the imminent opening of that clinic. (*Id.* at 225:24–226:4). Calvit confirmed that the

18

Hawai'i clinic would offer "insulin infusion treatment," but that it would use a modality other than Well Cell's "physiologic insulin resensitization." (*Id.* at 226:2–16). Calvit testified that the Hawai'i clinic would instead perform "microburst insulin infusion." (*Id.* at 227:8–18). Calvit repeatedly asserted that the microburst process was different from Well Cell's process, but he was unable to explain with any detail how the processes were different. (*Id.* at 231:4–10). He claimed that the Hawai'i clinic would perform insulin infusion therapies but that, even as the opening of the clinic approached, he had not told Well Cell. Calvit testified that he intended to let Well Cell know about the Hawai'i clinic, but he had not done so because "[it] weren't prepared and ready to open up." (*Id.* at 225:4–10). Calvit's testimony and the evidence that the defendant Insulinic clinics were marketing themselves using Well Cell's kits and descriptions and approaches leads the court to conclude that the defendants were attempting to conceal information about what they were doing in their clinics, including the Hawai'i clinic, from Well Cell.

Finally, Calvit's conclusory testimony that the microburst insulin infusion modality does not involve the misappropriation of Well Cell's trade secrets is not credible. The record shows that the defendants are likely continuing to use the knowledge, training, equipment, and processes they obtained from Well Cell under the now-terminated license agreements.

The court finds that Well Cell has shown a likelihood of success on the merits of its trade-secret claims.

### C.    Irreparable Harm

Well Cell argues that the continued infringement of its intellectual property risks doctor, patient, and consumer confusion and irreparable harm to its reputation and business goodwill. (Docket Entry No. 4 ¶ 84). These harms are inherently difficult to quantify and are paradigmatic examples of irreparable harm in the commercial context. *See, e.g.*, *Emerald City Mgmt., L.L.C. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015).

When a party seeks injunctive relief with respect to its patents, there must be a "showing of some causal nexus between [the alleged] infringement and the alleged irreparable harm." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012). The court finds that Well Cell has shown this nexus. The '990 Patent relates to Well Cell's proprietary treatments. The misuse of that intellectual property risks harm to Well Cell. Hepford testified that, given the past relationship between Calvit, Calvit's Insulinic clinics, and Well Cell, if Calvit "does things that are illegal and improper and ultimately ends up getting in trouble for that . . . and then . . . point[s] his fingers back and say[s], but these guys, they were the ones that taught me all this stuff," then Well Cell is put at risk. (Hepford Tr. at 170:1–8). Hepford continued,

> And the worst part in this is that he actually puts his patients' health at risk because he is not able to maintain their care, thus also putting us at risk of not being able to provide licenses to everyone if ultimately we are in trouble along with him doing all the bad things that he is doing.

(*Id.* at 170:16–22). Hepford convincingly testified that the defendants' unlicensed use of Well Cell's modality risks irreparable harm to Well Cell and to the members of the public who seek medical treatment from the Insulinic clinics.

### D.   Balance of Equities

The balance of equities weighs in favor of Well Cell. The defendants have not argued that the entry of a temporary restraining order would cause them irreparable harm. Calvit testified that Well Cell's technologies are only part of the services offered at their clinics. The balance of equities favors issuance of a preliminary injunction forbidding the defendants from using any of the Well Cell proprietary information, equipment, training, and treatments.

### E.   Public Interest

The public interest favors protection of intellectual property and therefore weighs in favor of issuing the preliminary injunction Well Cell seeks. The public interest is also served by

20

prohibiting the defendants from using the Well Cell technology without a license to do so to treat individuals suffering from diabetes or other metabolic disorders.  The defendants do not contend that the inability to offer Well Cell's technologies at their clinics risks harm to their economic interests, given their ability to offer other treatments; risks harm to patients; or is otherwise against the public interest.

## IV.    Conclusions of Law

The court enters the following conclusions of law:

1.    Well Cell has standing to assert its patent and trade-secrets claims.

2.    Well Cell is substantially likely to prevail on the merits of its patent-infringement claims regarding the '990 Patent.

3.    Well Cell is substantially likely to prevail on the merits of its trade-secrets claims.

4.    Well Cell will suffer irreparable harm absent a preliminary injunction.

5.    The balance of equities favors the entry of a preliminary injunction with respect to Well Cell's trade-secrets and '990 Patent claims.

6.    The public interest would not be disserved by entry of a preliminary injunction with respect to Well Cell's trade-secrets claims.

The court will separately enter an order of preliminary injunction.  The order will include a bond of $50,000.  The parties must appear at a hearing for a permanent injunction on **Tuesday, January 31, 2023, at 10:00 a.m., in Courtroom 11B**.

SIGNED on November 10, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge